**UNITED STATES of America**

v.

**Ronald McHUGH.**

**Criminal Action No. 1:96–CR–0201–JOF.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Jan. 10, 1997.

**1280**

David Edward McClernan, Asst. U.S. Atty., Atlanta, GA, for Government.

R. Gary Spencer, Federal Defender Program, Atlanta, GA, for Defendant.

### ORDER

FORRESTER, District Judge.

This matter is before the court on Defendant Ronald McHugh's two motions to dismiss [10–1, 17–1]. Also pending before the court is Magistrate Judge John E. Dougherty's Report and Recommendation that Defendant's first motion to dismiss be denied [13–1].

## I. STATEMENT OF THE CASE

On May 3, 1996, the Government filed a one-count information that charged Defendant Ronald McHugh with a violation of the Federal Child Support Recovery Act, 18 U.S.C. § 228 ("CSRA").

The CSRA provides that "whoever willfully fails to pay a past due support obligation with respect to a child who resides in another State shall be punished...." 18 U.S.C. § 228(a). The statute further defines "past due support" as any amount determined by a court order or an administrative process to be due that remains unpaid for over a year or is in an amount over $5000. 18 U.S.C. § 228(d)(1).

## II. DISCUSSION

### A. *Violation of Constitution*

In his first motion to dismiss, Defendant contends that the CSRA exceeds the power of Congress under the Commerce Clause and infringes on the powers reserved to the states under the Tenth Amendment.

In making his argument, Defendant primarily relies on *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), and three district court cases where the courts concluded that the CSRA was unconstitutional: *United States v. Mussari,* 894 F.Supp. 1360, *recon. denied,* 912 F.Supp. 1248 (D.Ariz.1995), *rev'd,* 95 F.3d 787 (9th Cir.1996); *United States v. Schroeder,* 894 F.Supp. 360, *recon. denied,* 912 F.Supp. 1240 (D.Ariz.1995), *rev'd,* 95 F.3d 787 (9th Cir. 1996); *United States v. Bailey,* 902 F.Supp. 727 (W.D.Tx.1995).

In *Lopez,* the Supreme Court struck down the Gun–Free School Zone Act of 1990 on the grounds that it exceeded the power of Congress to regulate commerce among the states. 514 U.S. at 551–53, 115 S.Ct. at 1626.[1] In its opinion, the court articulated

---

1. The Act struck down made it a federal offense      "for any individual knowingly to possess a fire-

three "broad" areas of congressional commerce power. First, Congress has the power to "regulate the use of the channels of interstate commerce." *Id.* at 558, 115 S.Ct. at 1629. Second, Congress can "regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." *Id.* Finally, Congress can regulate "those activities having a substantial relationship to interstate commerce." *Id.* at 558–59, 115 S.Ct. at 1629–30. The Supreme Court quickly determined that the Gun–Free School Zones Act failed either to regulate the use of channels or to protect the instrumentalities of interstate commerce. *Id.* at 559–61, 115 S.Ct. at 1630. The Court therefore concentrated on the issue of whether the Act regulated an activity that "substantially affected" interstate commerce. The Court concluded that it did not, because it was a criminal statute that "by its terms" had nothing to do with commerce or economic enterprise, and because it failed to include any jurisdictional element which would ensure a link to interstate commerce. *Id.* at 559–63, 115 S.Ct. at 1630–31.

The district courts that Defendant relies upon, after considering *Lopez,* concluded that the CSRA violated the Commerce Clause because: (1) it is a criminal statute that has no explicit link to interstate commerce or to economic activity; (2) the jurisdictional element that the delinquent parent and the child reside in different states is too tenuous a tie to interstate commerce, since the statute is not limited to those delinquent parents who fled to another state to avoid payment of child support; (3) nonpayment of child support simply does not substantially affect interstate commerce. *Mussari,* 894 F.Supp. at 1363–65; *Schroeder,* 894 F.Supp. at 364–67.

As a preliminary matter, the court notes that since the time that Defendant filed his motion, the district court opinions in *Mussari* and *Schroeder* have been reversed by the Ninth Circuit. *See United States v. Mussari,* 95 F.3d 787 (9th Cir.1996). Further-

more, two other Circuits, the Second and the Tenth, have concluded that the CSRA does not violate either the Commerce Clause or the Tenth Amendment. *See United States v. Sage,* 92 F.3d 101 (2d Cir.1996); *U.S. v. Hampshire,* 95 F.3d 999 (10th Cir.1996). Moreover, in addition to the six district court opinions that the Government cited in the appendix to its response brief as upholding the CSRA, several more district courts have found it to be constitutional. *See U.S. v. Johnson,* 940 F.Supp. 911 (E.D.Va.1996); *U.S. v. Lewis,* 936 F.Supp. 1093 (D.R.I.1996); *U.S. v. Sims,* 936 F.Supp. 817 (N.D.Okla. 1996); *U.S. v. Ganaposki,* 930 F.Supp. 1076 (M.D.Pa.1996).

■ For essentially the reasons expressed in the courts that have found the CSRA to be constitutional, the court concludes that the CSRA does not violate the Commerce Clause.[2]

Unlike the Gun–Free School Zones Act which was struck down in *Lopez,* the CSRA has a jurisdictional element. In order for a federal prosecution under it to be successful, the delinquent parent must be outside the state where his or her dependent child resides and must face an obligation to pay funds from his or her state to the child in the other state. 18 U.S.C. § 228(a). As a result, liability under the CSRA will only attach when the parent and the child live in different states so that any payment from the parent to the child will have to move in interstate commerce. Furthermore, in order for the child and the parent to reside in different states, one of them must at some point have crossed state lines.

Once the requirements of this Jurisdictional element is understood, it is clear that Congress was acting within its Commerce Clause powers in passing the CSRA. Specifically, the CSRA is within Congress' power to "regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce." *See Lopez,* 514 U.S.

---

arm at a place that the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922(q)(1)(A).

**2.** The Commerce Clause provides that "Congress shall have power ... to regulate Commerce ... among the several States...." U.S. Const. art. I, § 8, cl. 3.

at 558, 115 S.Ct. at 1629. This court agrees with the Ninth Circuit and its statement that:

> The obligation of a parent in one state to provide support for a child in a different state is an obligation to be met by a payment that will normally move in interstate commerce—by mail, by wire, or by electronic transfer of funds. That obligation is, therefore, a thing in interstate commerce and falls within the power of Congress to regulate. The frustration of satisfaction of the obligation by the failure of the debtors to pay is an impediment to interstate commerce that Congress can criminalize as it has criminalized other impediments to interstate commerce. *E.g., Heart of Atlanta Motel, Inc. v. U.S.,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964).

*Mussari,* 95 F.3d at 790. *Accord Sage,* 92 F.3d at 105–07 (2d Cir.1996); *Hampshire,* 95 F.3d at 1003 (10th Cir.1996).

In addition, the CSRA is a constitutional exercise of Congress' power because the conduct that it regulates substantially affects and has a substantial relationship to interstate commerce. *See Hampshire,* 95 F.3d at 1004; *Lewis,* 936 F.Supp. at 1098–1100; *U.S. v. Kegel,* 916 F.Supp. 1233, 1237–38 (M.D.Fla.1996). Unlike the statute dealt with in *Lopez,* the CSRA regulates an economic activity. Furthermore, Congress included specific findings in the CSRA regarding delinquent child support payments and their effect on interstate commerce. *See Hampshire,* 95 F.3d at 1004. For example, Congress indicated that over five billion dollars worth of child support payments were not honored in 1989. *Id.* (citing H.R.Rep. No. 771, 102d Cong., 2d Sess. 5 (1992) (Judiciary Committee)). Given that approximately one-third of these delinquent payments were due from parents who lived in different states than their children, it is clear that nonpayment of child support creates a national problem that substantially affects interstate commerce. *See id.; Johnson,* 940 F.Supp. at 914; *Kegel,* 916 F.Supp. at 1237.

Finally, through the years courts have consistently upheld statutes analogous to the CSRA as valid congressional exercises of Commerce Clause power. One such similar statute is 18 U.S.C. § 1073, which makes it a federal crime for a person to cross state lines with the intent of avoiding prosecution for a felony.[3] This statute was found to be constitutional under the Commerce Clause because, in order for it be invoked, the fleeing person had to cross state lines. *Simmons v. Zerbst,* 18 F.Supp. 929, 930 (N.D.Ga.1937). After stating, that "the passage of a person from one state to another is interstate commerce," the *Simmons* court noted that, within a federal system containing modern transportation, state lines had become "bulwarks of defense" for those fleeing a state's criminal prosecution system. *Id.* If a person fled a state, that state's officials would have to drop their pursuit at the state line because they would have no authority in the other state. *Id.* Accordingly, the court concluded that "the withdrawal by Congress of the facilities of interstate commerce from such criminals is an appropriate means to a proper end, and the most effective way to prevent the use of interstate commerce to defeat justice." *Id. See also Hemans v. United States,* 163 F.2d 228, 239 (6th Cir.1947) (while upholding Fugitive Felon Act as constitutional, noted that general purpose of the Act is to aid states in enforcement of their laws and "to reach and bring to the bar a roving class of criminals").

In much the same way, a person who wished to avoid child support or alimony obligations in one state could take advantage of the ease of modern transportation and flee into another state. Having done so, they could almost safely assume that the state that they left would be powerless to force them to pay the money they owed. As discussed *supra,* in enacting the CSRA, Congress made explicit findings indicating the efforts of delinquent parents to take advantage of the multi-state system to avoid their obligations in individual states. *See Hampshire,* 95 F.3d at 1004 (citing H.R.Rep. No. 771 at 5–6).

---

**3.** 18 U.S.C. § 1703 had formerly been codified at 18 U.S.C. § 408(e) and called the Fugitive Felon Act.

In such instances, once a person flees across state lines to avoid legal obligations or sanctions in another state, Congress is surely within its Commerce Clause powers to regulate the matter. As the Second Circuit explains, "All the [CSRA] does is enable the United States to help [a state] do what it could not do on its own, namely, enforce [an] obligation to send money from one State to another. Congress was not impotent to overcome the obstacles inherent in our Federal system to the enforcement of that obligation." *Sage*, 92 F.3d at 105. Both the CSRA and 18 U.S.C. § 1073 are aimed at preventing a person from escaping his legal responsibilities or law enforcement officials "by taking advantage of our federal system of government through flight to another state." *See United States v. Murphy*, 893 F.Supp. 614, 616 (W.D.Va.1995), *vacated*, 934 F.Supp. 736 (W.D.Va.1996) (vacated on grounds of improper venue). Congress, by its criminalizing such conduct, is simply acting within its power to strengthen, and not displace, state laws. *See Hampshire*, 95 F.3d at 1004; *Sage*, 92 F.3d at 107.

Viewed in this light, the court notes that this use of federal power is consistent with that envisioned by the founding fathers when they drafted the Constitution. In that text, the Drafters, surely recognizing the federal nature of our system and the existence of state lines, included the Full Faith and Credit Clause. That clause provides that "Full Faith and Credit shall be given in each State to the public acts, Records, and judicial proceedings of every other State...." U.S. Const. art. IV, § 1. As the Supreme Court later noted,

> [T]he very purpose of the full faith and credit clause was to alter the status of the several states as independent foreign sovereignties, each free to ignore obligations created under the laws or by the judicial proceedings of the others, and to make them integral parts of a single nation throughout which a remedy upon a just obligation might be demanded as of right, irrespective of the state of its origin.

*Milwaukee County v. M.E. White Co.*, 296 U.S. 268, 276–77, 56 S.Ct. 229, 234, 80 L.Ed. 220 (1935). *See also Magnolia Petroleum Co. v. Hunt*, 320 U.S. 430, 439, 64 S.Ct. 208, 214, 88 L.Ed. 149 (1943) (noting that Full Faith and Credit Clause, like the Commerce Clause, "became a nationally unifying force."), *overruled by plurality on other grounds*, 448 U.S. 261, 268, 100 S.Ct. 2647, 2654, 65 L.Ed.2d 757 (1980). The CSRA, by preventing a person from avoiding a legal obligation in one state by simply residing in another state, upholds the principles behind the Full Faith and Credit Clause. The CSRA effectively removes the barriers imposed by state lines and helps to make all fifty states an "integral part of a single nation."

Having reached the above conclusion, the court finds Defendant's argument that the CSRA violates the Tenth Amendment without merit.[4] If Congress properly enacted the CSRA under its enumerated Commerce Clause power, then it could not have infringed on those powers reserved to the states. *See Mussari*, 95 F.3d at 791 (citing *New York v. United States*, 505 U.S. 144, 156, 112 S.Ct. 2408, 2417–18, 120 L.Ed.2d 120 (1992)); *Hampshire*, 95 F.3d at 1004. Furthermore, as discussed *supra*, the CSRA does not displace or intrude upon state law regarding the family and child support payments. Instead, it supplants the existing law and provides enforcement in the instances where state law is ineffective.

### B. *Violation of the Speedy Trial Act*

In his second motion, Defendant argues that a violation of the Speedy Trial Act, 18 U.S.C. § 3161, *et seq.*, mandates dismissal of the information.

The Speedy Trial Act requires that a defendant charged in an indictment or information be brought to trial within seventy days of the latter of either the appearance of the defendant before the court in which the charge is pending, or the date of the filing and making public of the indictment or information. 18 U.S.C. § 3161(c)(1). However,

---

4. The Tenth Amendment states, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

section 3161(h) provides that certain periods of time shall be excluded from consideration in calculating the seventy-day time frame. There are two sections, in particular, that address delay caused by pretrial motions:

3161(h)(1)(F): delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion.

3161(h)(1)(J): delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court.

The effect of these two sections is that the time that is excluded is treated differently in motions that require hearings than it is in motions that do not require hearings. *See U.S. v. Elkins*, 795 F.2d 919, 922–23 (11th Cir.), *cert. denied*, 479 U.S. 952, 107 S.Ct. 443, 93 L.Ed.2d 391 (1986); *U.S. v. Davenport*, 935 F.2d 1223 (11th Cir.1991).

■ Where there is a pretrial motion that requires a hearing, section 3161(h)(1)(F) provides that the delay from the time that the motion is filed to the conclusion of a hearing on the motion shall be excluded. *United States v. Mendoza–Cecelia*, 963 F.2d 1467, 1476 (11th Cir.), *cert. denied*, 506 U.S. 964, 113 S.Ct. 436, 121 L.Ed.2d 356 (1992); *United States v. Phillips*, 936 F.2d 1252, 1254 (11th Cir.1991) ("the entire time from the filing of the motion to the conclusion of the hearing is excludable, even when the hearing is deferred until trial"). Once the hearing is held, however, and after all the submissions that are necessary to decide the issue are before the court, then section 3161(h)(1)(J) applies and the court has no more than thirty excludable days to consider it. *U.S. v. Mers*, 701 F.2d 1321, 1336 (11th Cir.), *cert. denied*, 464 U.S. 991, 104 S.Ct. 481, 78 L.Ed.2d 679 (1983); *Davenport*, 935 F.2d at 1228; *U.S. v. Rodriguez*, 63 F.3d 1159, 1163 (1st Cir.1995).

■ When there is a pretrial motion that does not require a hearing, the thirty day advisement period set out in 3161(h)(1)(J) applies once all the papers that the court reasonably expects to have before it when deciding the case have been submitted. *Elkins*, 795 F.2d at 922–23; *Davenport*, 935 F.2d at 1228; *U.S. v. Johnson*, 29 F.3d 940, 942–43 (5th Cir.1994); *Rodriguez*, 63 F.3d at 1163 (citing *Henderson v. U.S.*, 476 U.S. 321, 329, 106 S.Ct. 1871, 1876, 90 L.Ed.2d 299 (1986)). In *Elkins*, the Eleventh Circuit discussed *Henderson* and its analysis of the interplay between sections 3161(h)(1)(F) and 3161(h)(1)(J). The court stated that if no hearing was required in a pretrial motion, then 3161(h)(1)(J) demanded that the disposition of the motion be "prompt." *Elkins*, 795 F.2d at 923. "Prompt" was then interpreted as meaning the same as 3161(h)(1)(J), in that only thirty days could be excluded of the period after which a court took a matter under advisement. *Id.* Accord *Johnson*, 29 F.3d at 943.

A further complication in the Speedy Trial Time calculation occurs when a matter is referred to a Magistrate Judge for a Report and Recommendation. When a motion is submitted to a Magistrate Judge for a Report and Recommendation, the Eleventh Circuit has held that there are two thirty-day periods for consideration of the same matter. *Mers*, 701 F.2d at 1336. The Magistrate Judge has thirty days once he takes the matter under advisement, and the district court has a separate and distinct thirty days once it takes the issued Report under advisement. *Id.*

In *Mers*, for example, the defendant filed a motion to suppress on March 13 and the Magistrate Judge set a hearing date. *Id.* at 1335. On April 22, a later date set for the hearing, however, the Magistrate Judge realized that no hearing would be necessary. The Report and Recommendation was later issued on May 18, 1996. The Report was submitted to the district court on June 2 after no objections were filed, and it was adopted by the district court on August 3. *Id.* The Eleventh Circuit concluded that the forty-one days from the time that the motion to suppress was filed with the Magistrate (March 13) to the time when the Magistrate decided that he did not require a hearing was properly excluded under section 3161(h)(1)(F). *Id.* However, once the Magistrate Judge knew that no hearing was required and all the submissions necessary to decide the case were before him, the matter

was considered under advisement and section 3161(h)(1)(J) controlled. As a result, the *Mers* court determined that the twenty-six days between April 22 to the issuance of the Report and Recommendation were excludable under section 3161(h)(1)(J). *Id.* In addition, the Eleventh Circuit determined that the district court had the matter under advisement from the time of the submission of the Report on June 2 to its adoption on August 3, and that, pursuant to section 3161(h)(1)(J), only thirty of those days could be excluded. *Id.*

Another example of the application of the Speedy Trial Act to a Magistrate Judge's Report and Recommendation can be seen in *U.S. v. Gomez–Villamizar,* 762 F.Supp. 1550 (D.Puerto Rico 1991). In that case, the district court faced an almost identical situation to the case at bar. A motion to dismiss had been referred to a Magistrate for a Report and Recommendation on December 18, 1990. *Id.* at 1551. The Magistrate Judge issued the Report seventy-two days later, on February 28, 1991. *Id.* As the docket revealed that no hearings had been held and that no further briefs were submitted to the Magistrate during the seventy-two days, the court concluded that the matter was under advisement for the entire period and excluded, pursuant to section 3161(j), only thirty of the seventy-two days. *Id.*

The court notes the following time line of events in Defendant's case:

- June 19, 1996—Defendant arraigned on filed information charging violation of the CSRA;
- July 2, 1996 —Magistrate Judge orally granted motion giving Defendant ten days to file a motion to dismiss;
- July 15, 1996—With Magistrate Judge's permission, Defendant filed first motion to dismiss;
- July 18, 1996—Government filed response to motion;
- Dec. 9, 1996 —Magistrate Judge Dougherty issued a Report and Recommendation on the motion;
- Dec. 16, 1996—Defendant filed a second motion to dismiss alleging a violation of the Speedy Trial Act.

In the present case, the Defendant contends that over a hundred days passed after the time the Magistrate Judge received the government's response to the motion to dismiss, and that no more than thirty of those days are excluded. The Government responds that all of the time between the filing of Defendant's motion to dismiss on July 15 and the issuance of the Report on December 9, 1996 should be excluded pursuant to section 3161(h)(1)(J).

As the court discussed *supra,* if the pretrial motion is one which does not require a hearing, then section 3161(h)(1)(F) and its total exclusion does not apply. *See Phillips,* 936 F.2d at 1254. A motion to dismiss an information because the underlying statute is unconstitutional is not a motion that requires a hearing. As a result, the time between when the motion to dismiss was filed and when the Magistrate Judge had all the necessary filings before him to reach a decision is excluded under section 3161(h)(1)(F). However, once all such filings were before the Magistrate Judge, the matter was under advisement and only thirty of the days until the issuance of the Report are excludable under section 3161(h)(1)(J).

Therefore, pursuant to section 3161(h)(1)(J), the time period between July 15, when the Defendant filed his motion to dismiss, and July 18, when the Government filed its response, is excluded as pretrial motion practice. As of July 18, 1996, the Magistrate Judge had received "all anticipated briefs" on the motion to dismiss, and therefore, in the absence of any indication of the necessity of a hearing, the matter was taken under advisement at that point. *See Mers,* 701 F.2d at 1336; *U.S. v. Campbell,* 706 F.2d 1138, 1143 n. 12 (11th Cir.1983); *Johnson,* 29 F.3d at 944 (holding that motion that had no hearing was taken under advisement on day last paper concerning the motion was filed with the court). The Magistrate Judge issued his Report and Recommendation on December 9, 1996. As a result, a period of approximately 140 days passed before a decision was made on the motion under advisement. Once the thirty days excluded under section 3161(h)(1)(J) are subtracted, over seventy "speedy trial"

days still passed before the Report was issued. *See Campbell,* 706 F.2d at 1143 n. 12. Given that additional "speedy trial" days had passed before the motion to dismiss was filed, it is clear that Defendant's rights under the Speedy Trial Act were violated as his case was not brought to trial within seventy days, excluding those days provided for in section 3161(h).

■ Pursuant to section 3162(a)(2), if the Speedy Trial Act is violated, "the information shall be dismissed on motion of the defendant." However, the Act provides that the district court may dismiss the information with or without prejudice. *U.S. v. Miranda,* 835 F.2d 830, 834 (11th Cir.1988). In making this determination, the statute lists the following factors for the court to consider: "the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice." 18 U.S.C. § 3162(a)(2); *U.S. v. Russo,* 741 F.2d 1264, 1266–68 (11th Cir.1984). The decision is within the sound discretion of the district court, so long as the court considers the statutory factors and articulates its reasoning. *U.S. v. Taylor,* 487 U.S. 326, 336–37, 108 S.Ct. 2413, 2419–20, 101 L.Ed.2d 297 (1988); *U.S. v. Godoy,* 821 F.2d 1498, 1505–06 (11th Cir.1987).

### a. Seriousness of crime

The CSRA authorizes, for a first offense, a punishment of a fine and imprisonment up to six months. 18 U.S.C. § 228(b)(1). Given that the charge is only a misdemeanor, the court considers the crime to be only moderately serious. This factor therefore weighs in favor of a dismissal with prejudice.

### b. Facts and circumstances leading to dismissal

Defendant's motion to dismiss was only filed after the Magistrate Judge granted him an extension of time to file it after the pretrial conference. Furthermore, the motion to dismiss was filed during the midst of the Centennial Olympic Games, a time when the court notes that the Judicial system, like the entire city of Atlanta, had its normal proceedings disrupted. In addition, the motion to dismiss was a constitutional challenge that involved a complex legal issue that had not been addressed yet by the Eleventh Circuit. Had the Magistrate Judge so desired, these reasons would have likely justified an order certifying as excluded the time between the filing and the disposition of the motion. 18 U.S.C. § 3161(h)(8)(A); *Campbell,* 706 F.2d at 1140 n. 4. Finally, the court notes that, after filing the complex motion, Defendant did nothing to press his right for a speedy trial. *See Johnson,* 29 F.3d at 946. These factors all counsel for a dismissal without prejudice.

### c. Impact of reprosecution

The court does not find any evidence of a bad faith motive on the part of the Government or any effort to bring about the delay in the Magistrate Judge ruling on the motion. In fact, there is no evidence to suggest that the Government in any way desired the delay. Instead, an administrative oversight seems to be the cause for the violation. In addition, the court notes that the delay was not extreme and that consequently the violation of the Speedy Trial Act was not egregious. *See Godoy,* 821 F.2d at 1506 n. 2 (citing *U.S. v. Stayton,* 791 F.2d 17, 21 (2d Cir.1986), for proposition that twenty-three month delay can be "dominating factor" in decision to dismiss with prejudice). The court also concludes that Defendant, who has been released on bond during the pendency of this matter, was not prejudiced due to the delay. *See U.S. v. Phillips,* 775 F.2d 1454, 1456 (11th Cir.1985). Indeed, as the Government pointed out, the reason the delay occurred at all was Defendant's filing of a complex constitutional attack after the initial pretrial conference. Furthermore, given the circumstances, there is no reason to believe that a dismissal without prejudice in this instance would encourage the Government to flout the Speedy Trial Act in the future. As a result, the court does not believe that allowing reprosecution will have a negative effect on administration of the Speedy Trial Act in the future. After balancing these factors, the court concludes that they weigh in favor of a dismissal without prejudice.

■ For the foregoing reasons, and after a careful consideration of the above factors, the court finds that dismissal without prejudice would be appropriate.

## III. CONCLUSION

Defendant's motion to dismiss due to the alleged unconstitutional nature of the CSRA is DENIED [10–1]. Defendant's motion to dismiss due to a violation of the Speedy Trial Act is GRANTED [17–1]. Pursuant to this court's discretion, the dismissal is WITHOUT PREJUDICE.